**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

**DERRICK GARRETT**                                    **CIVIL ACTION**

**VERSUS**                                            **NO.  10-1079**

**N. BURL CAIN**                                      **SECTION "A"(5)**


<u>**REPORT AND RECOMMENDATION**</u>

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations pursuant to 28 U.S.C. §636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, the Court has determined that a federal evidentiary hearing is unnecessary.  <u>See</u> 28 U.S.C. §2254(e)(2).[1] For the following reasons, it is recommended that the instant petition for habeas corpus relief be **DISMISSED WITH PREJUDICE.**

---

[1]Under 28 U.S.C. §2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. §2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. §2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.  28 U.S.C. §2254(e)(2)(B).

## I.   __PROCEDURAL BACKGROUND__

The petitioner, Derrick Garrett, is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On August 4, 2005, following trial by jury, Garrett was convicted in the Twenty-Second Judicial District Court for the Parish of St. Tammany of aggravated rape.  On May 22, 2006, Garrett was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence.

On March 23, 2007, the Louisiana First Circuit Court of Appeal affirmed petitioner's conviction, but amended his life sentence to provide that it was to be served at hard labor without benefit of parole, probation or suspension of sentence.  __State v. Garrett__, 953 So.2d 206 (Table), 2006-KA-1588, 2007 WL 865906 (La. App. 1 Cir. 2007).  On November 9, 2007, the Louisiana Supreme Court denied Garrett's writ application.  __State v. Garrett__, 967 So.2d 499 (La. 2007).

Following the completion of his direct appeal proceedings, petitioner sought post-conviction relief.  His efforts in this regard culminated on April 5, 2010, when the Louisiana Supreme Court denied his writ application.  __State ex rel. Garrett v. State__, 31 So.3d 359 (La. 2010).

On April 7, 2010, petitioner filed the instant federal habeas corpus petition.  (Rec. doc. 4).  In his supporting memorandum, petitioner raises the following claims, the same claims

2

that he raised in connection with his state post-conviction application: 1) he received ineffective assistance of trial counsel because counsel failed to challenge jurors, failed to move for mistrial, failed to object when trial court refused to release a witness from a subpoena, and failed to object to the testimony of a witness the second time she took the witness stand; 2) he received ineffective assistance of appellate counsel due to counsel's failure to raise on direct appeal the above claims in support of his ineffective assistance of counsel argument; 3) the State submitted improper rebuttal evidence; and, 4) the State committed "prosecutorial misconduct" in connection with its closing argument. On April 22, 2010, petitioner submitted an amended petition, along with a supplemental brief. (Rec. doc. 7). In his supplemental brief petitioner raises the following supplemental claims, the same claims he raised in connection with his direct appeal: 1) the evidence was insufficient to support his conviction; 2) he was denied his right to testify; 3) his court cases were improperly combined and consolidated; 4) he received ineffective assistance of counsel because counsel failed to object to an improper arraignment procedure and failed to adequately prepare for trial and jury selection and failed to properly understand criminal law and procedure; 5) he was denied his right to confront his accuser; 6) the trial court provided erroneous jury instructions; and, 7) the State committed "prosecutorial

misconduct" by misrepresenting facts to the jury. The State, in its Response (rec. doc. 13), concedes and a review of the record confirms that the instant action is timely and that Garrett has exhausted his state court remedies as required under Rose v. Lundy, 455 U.S. 509 (1982).

## II.   FACTS[2]

J.F., the victim, was an 82-year-old resident of Southerland Place, an assisted-living facility for the elderly in Mandeville, St. Tammany Parish.  J.F. lived in the veranda, which was the Alzheimer's unit.  There was also an assisted-living area, where the residents could, to some extent, care for themselves. Dr. Gregory Ciaccio, an expert in psychiatry, testified at trial that J.F.'s Alzheimer's disease was the cause of her dementia. Following a global assessment of her functioning, Dr. Ciaccio determined that J.F. had severe cognitive deficits.  He testified that she was not capable of rational thoughts or of making rational decisions.  He further testified that she did not have the ability to appreciate sexual acts and that she was not capable of consenting to sex.

On October 11, 2004, caregivers Tabitha May and Georgette Taylor were working in the Alzheimer's unit of Southerland Place

---

[2]The facts noted hereinafter are as set forth by the state appellate court in connection with Garrett's direct appeal.  State v. Garrett, 953 So.2d 206 (Table), No. 2006-KA-1588, 2007 WL 865906 (La. App. 1 Cir. 2007).

when they noticed that J.F. was missing.  Taylor searched the 100 hall of the unit, while May searched the 200 hall.  As May passed room 200, she saw the defendant, a licensed practical nurse working that night, coming out of the bathroom of that room, zipping up his pants with a book under one arm.[3]  When the defendant saw May, he said "when I got to go, I got to go."  Resident Janet Fortier was the person who lived in room 200.  As May and the defendant walked up the 200 hall, May asked him about J.F., whom the defendant said he had seen a few minutes ago.  May testified that the defendant was nervous and "babbling about other stuff."  She stated that the things he was saying about the hurricane, when they had to evacuate, were they paid right, were out of character.  Normally when a resident was missing, the nurse on duty would ask about the resident, but the defendant did not ask about J.F.  As they walked, May looked in each room calling out J.F.'s name.  When they got to room 210, the defendant continued in the same direction, likely back to the assisted-living area, while May turned around and went back down the hall alone toward Mr. Bob's room.[4]  She checked Mr.

---

[3]Employees used the bathroom located on the 100 hall, not the 200 hall.  The 100 hall had a bathroom for employees only.

[4]According to the trial testimony of the Southerland Place care manager, Deshone Cook, at some point, the supervisor, Angela Manders, told Cook to wash out J.F.'s mouth because she caught J.F. performing oral sex on Mr. Bob, a resident who was constantly trying to have relations with J.F.  When asked how many occasions Cook had "heard anything like this before in reference to [J.F.]," Cook responded, "Many occasions."  Cook testified that she had seen Mr. Bob touch J.F.'s breast, but J.F. did not seem to have any

Bob's room and found him sleeping on the couch.  No one else was in his room.

As May went back up the hall, May heard Taylor scream her name.  May found Taylor standing outside the door of room 200.  May went inside the room and saw J.F. by the bathroom door fixing her

------

indication she knew what was going on.  Regarding the habits of Mr. Bob and his sexual advances toward J.F., Cook testified:

Q. Mr. Bob has a room on the veranda, doesn't he?

A. Yes, he does.

Q. When Mr. Bob would try and do things with [J.F.], where would he try and go?

A. To his room.

Q. Did Mr. Bob ever try and take [J.F.] to any other room?

A. No, he hadn't.

Q. Did you ever know Mr. Bob to go into any other room to be with a woman?

A. No, I haven't.

Q. So the only place where Mr. Bob tried to do anything was in his own room?

A. Yes.

Q. Was Mr. Bob somebody who would wander into other people's rooms?

A. No, he wasn't.

Q. So would it in fact be unusual for Mr. Bob to have taken [J.F .] into, say, Ms.-Room 200 on October 11 of 2004?

A. No, he wouldn't have took (sic) her into Room 200.

Q. If Mr. Bob would have taken her somewhere, where would he have gone?

A. He would have gone to his room, which was 203.

Q. From your observations, what sort of, I think Mr. Nunnery (defense counsel) used the term sexual favors, was Mr. Bob looking for?

A. Oral sex.

Q. But never any vaginal?

A. Never any vaginal.

clothes and pulling up her pants, which were down below her leg. May called her supervisor, who told May to call the director. May testified that the time from when she saw the defendant come out of room 200 to the time she saw J.F. in room 200 was less than five minutes. She further testified that when she was going up and down the hall, she saw no other residents.

Taylor testified that she found J.F. in the bathroom of room 200 struggling to pull up her pants and her briefs. According to Taylor, J.F. had never gone in room 200 before. Taylor stated that when she found J.F., J.F. looked scared. J.F. was holding herself around her lower stomach toward the vaginal area. J.F. was not able to tell Taylor anything. After May came into the room, Taylor and May took J.F. to her (J.F.'s) room. The defendant came by J.F.'s room, and when J.F. heard the defendant's voice, J.F. jumped. Taylor stated that she had never seen J.F. react that way or scared like that before. While Taylor was helping J.F. get undressed, Taylor noticed some blood in J.F.'s briefs.

By the time officers from the Mandeville Police Department arrived at Southerland Place, the defendant had clocked out and left. Officer Marco Nuzzolillo with the Mandeville Police Department testified that Southerland Place staff contacted the defendant requesting that he immediately return. The defendant was at a McDonald's restaurant about seven miles away from Southerland Place. The defendant indicated that he would return, but when he

left the parking lot, he headed in a direction away from
Southerland Place.  Officer Perry Otillio with the Mandeville
Police Department and deputies from the St. Tammany Parish
Sheriff's Office stopped the defendant.

On that same evening, J.F. was brought to the hospital
where Dr. Kevin Erwin, an emergency room physician, did a rape kit
of J.F.  He also examined J.F. to determine if she had been sexual
assaulted.  During his examination Dr. Erwin found a small vaginal
tear.  According to Dr. Erwin, the tear was not linear.  Rather, it
was the kind of tear that one would see with dilation of the
entrance of the vagina.  The tear was recent because the blood in
the area was bright red, not dark, coagulated blood.  On direct
examination, Dr. Erwin was asked, "So basically she was spread too
much and her skin tore?"  He responded, "Yes."  On cross-
examination, Dr. Erwin testified that there were other
possibilities other than penile penetration that could have caused
the vaginal tear, such as fingers, an instrument, or a sex toy.
Dr. Erwin indicated that he had heard that J.F.'s swabs, including
vaginal, taken from the rape kit did not contain the defendant's
DNA.  Dr. Erwin stated it was possible that, following a rape, DNA
would not be present if the victim did not scratch the assailant,
if the assailant used a condom, or if there was no penile
penetration.  However, despite these possibilities, Dr. Erwin
indicated that it was more probable that all of these tests

8

performed via a rape kit would yield a DNA profile.  Dr. Erwin also testified under cross-examination that J.F.'s medical history indicated she had endometrial hyperplasia, a symptom of which is vaginal bleeding.  On redirect examination, Dr. Erwin indicated that a reasonable explanation for why no ejaculate would be found in a rape victim would be if the perpetrator withdrew his penis before ejaculating.  Dr. Erwin responded affirmatively when asked if it was possible that if someone placed his penis into a vagina and withdrew it, cells from the vagina would end up on the penis.

Joanie Wilson, a Louisiana State Police Crime Lab DNA analyst, testified that she obtained DNA samples from the defendant's underwear and from a paper tissue obtained from the scene,[5] both of which contained the defendant's seminal fluid. On three separate stains on the defendant's underwear, Wilson performed a DNA extraction.  Through a separation technique, she obtained a top, lighter layer known as an epithelial fraction. On this epithelial layer, Wilson found a mixture of J.F.'s and the defendant's DNA.  In other words, J.F.'s DNA was present in the stains found on the defendant's underwear.  In reading from her report in reference to a particular stain, Wilson stated that the "DNA profile from the epithelial fraction from the cutting of stain S-3 from the underwear was 3.22 billion times more likely to be a

---

[5]The paper tissue was found in the trash can in the bathroom of room 200.

mixture of DNA from [J.F.] and Derrick Garrett than a mixture of DNA from Derrick Garrett and a randomly selected individual." Wilson further testified that the mixture came from only two people and that she found no evidence of a third person. When asked what result she would expect if a penis inserted into a vagina were withdrawn and then swabbed, Wilson stated she would expect to get the female profile mixed in with the male profile. On the piece of tissue tested, Wilson stated that the probability of finding the same DNA coming from a randomly selected individual other than the defendant was approximately one in 1.75 trillion.

Defendant did not testify at trial.

III. **STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. §2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under §2254(d)(1) and questions of fact are reviewed under §2254(d)(2). Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

10

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. §2254(d)(1).  The United States Supreme Court has noted:

> §2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams[ v. Taylor</u>, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

<u>Bell v. Cone</u>, 535 U.S. 685 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §2254(d)(2); <u>see</u> <u>also</u> <u>Hill</u>, 210 F.3d at 485; 28 U.S.C. §2254(e)(1).

IV.  **ANALYSIS**

   A.  **Ineffective Assistance of Counsel**[6]

        The seminal Supreme Court decision regarding ineffective
assistance of counsel is <u>Strickland v. Washington</u>, 466 U.S. 668,
697 (1984), wherein the Court held that in order to prove that
counsel was ineffective, petitioner must demonstrate that counsel's
performance was deficient and that the deficient performance
prejudiced the defense.  If a court finds that petitioner has made
an insufficient showing as to either one of the two prongs of
inquiry, it may dispose of the claim without addressing the other
prong.

        Under the deficient performance prong of the <u>Strickland</u>
test, "it is necessary to 'judge...counsel's challenged conduct on
the facts of the particular case, viewed as of the time of
counsel's conduct.'"   <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371
(1993) (citing <u>Strickland</u>, 466 U.S. at 690).  To prove prejudice
under the <u>Strickland</u> standard, petitioner "must show that there is
a reasonable probability that, but for counsel's unprofessional

_____

        [6]The Court, at this juncture, will address the arguments set
forth in both petitioner's original memorandum (rec. doc. 4) and
his supplemental brief (rec. doc. 7) in support of his claim of
ineffective assistance of counsel.

errors, the result of the proceeding would have been different."
Strickland, 466 U.S. at 694.

1.  Failure to Challenge Jurors and Adequately Prepare
for Voir Dire Selection

Garrett argues that counsel was ineffective and
inadequately prepared for voir dire selection based upon his
failure to challenge jurors who, according to Garrett, were not
impartial.  His argument in this regard is not based upon any
admission by jurors that they could not be impartial.  Instead, it
is based upon the following admissions: 1) some had heard about the
crime at issue; 2) some had been victims of crimes; 3) some were
related to or were associated with persons with Alzheimer's disease
or persons who were otherwise disabled; 4) some were related to or
friends with law enforcement officials; 5) some were not anxious to
sit on a jury; 6) one had sat on a previous jury which had rendered
a guilty verdict; and, 7) some who, on a one to ten scale, rated
the trustworthiness of police officials at a six.  (Rec. doc. 4,
pp. 7-8).

The above admissions are insufficient for the purpose of
showing that Garrett was denied an impartial jury and, therefore,
that he was prejudiced by counsel's failure to strike these jurors.
As the Supreme Court explained, "[t]o hold that the mere existence
of any preconceived notion as to the guilt or innocence of an
accused, without more, is sufficient to rebut the presumption of a

13

prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 723 (1961) (citations omitted).  Indeed, habeas relief is generally not warranted in the absence of an indication from a venire member that he or she cannot be fair and/or impartial.  See Virgil v. Dretke, 446 F.3d 598,609-610 (5th Cir. 2006) (Counsel deficient in not challenging a juror who "stated that his relationship with law-enforcement officers would preclude him from serving as an impartial juror"; and in not challenging a second juror who admitted that "he could not be 'fair and impartial'"); Hughes v. United States, 258 F.3d 453, 456 (6th Cir. 2001) (actual bias found where venire member admitted: "I don't think I could be fair."). Accordingly, based upon the evidence presented, the Court finds that Garrett has failed to satisfy his burden of proof under Strickland.

2.   Failure to Move for Mistrial

Garrett argues that counsel was ineffective due to his failure to move for a mistrial based upon the prosecution's alleged improper reference to Garrett's failure to testify at trial. During his closing argument, defense counsel asserted that Garrett was late for work on the day in question because he made love to his wife, jumped up, put his clothes on and ran out of his house,

14

thereby attempting to explain why semen was found on a tissue near the victim.  (State rec., vol. 6 of 8, pp. 1270-1271).  In rebuttal, the prosecutor inquired whether jurors could recall any testimony being offered at trial to support defense counsel's assertion that Garrett had made love to his wife then bounded out the door for work.  (State rec., vol. 6 of 8, p. 1272).  In response, defense counsel objected, arguing outside the presence of the jury that the prosecutor had improperly made reference to the fact that Garrett did not take the witness stand.  (State rec., vol. 6 of 8, p. 1273).  Garrett argues that counsel's objection was insufficient, that counsel should have moved for a mistrial. According to Garrett, the trial judge "assured defense counsel and the prosecutor that the error was serious enough for her to grant a mistrial, if defense counsel requested it."  (Rec. doc. 4, pp. 12-13; rec. doc. 14, pp. 7 and 8).

A review of the trial transcript reflects that contrary to Garrett's assertion, the trial judge did not assure counsel that, based upon the prosecutor's remark, she would grant a mistrial if only defense counsel requested one.  Instead, as reflected below, the trial judge admonished the prosecutor that he had come perilously close to commenting on Garrett's failure to testify and warned him not to make any statement which could prompt the jury to even think about the fact that Garrett did not testify. The court further warned that if the prosecutor made such a comment

15

and Garrett was convicted, his conviction would get reversed on
appeal.

BY MR. NUNNERY [defense counsel]:

Your Honor, he just made a comment with reference to
[did] any of you hear the testimony to this effect.  That
directly implies to this jury, and it's our rights, Mr.
Garrett's right, . . . not to testify.  To even make a
reference to him testifying or not testifying is just
wrong.  It is wrong.

BY MR. WEILBAECHER [prosecutor]:

Okay, there has been no evidence to that effect.
There have been a variety of witnesses who were at the
place that these questions could have been asked of.  I
was making a reference to the fact that - -

BY MR. NUNNERY:

You said - -

BY MR. WEILBAECHER:

M[r]. Garrett's wife, there was no testimony from
M[r]. Garrett's wife.  M[r]. Garrett's wife was a source
- - could have been a source of this information.  It was
not a statement with regard to Mr. Garrett.

BY. MR. NUNNERY:

We had nothing to prove, Your Honor.  We had nothing
to prove.

BY THE COURT:

He didn't need to call any witnesses.  He didn't
need to present any evidence.  He didn't need to testify.
Why on earth did you go there?

BY MR. WEILBAECHER:

When the defense attorney makes a statement, in
rebuttal I'm allowed to reply to it.  He made a
statement.  I replied to it.  Mr. Garrett would not have

been the only source of that information.  It could have
been his wife . . . .


BY MR. NUNNERY:

    Your Honor, nobody was in that bedroom with Mr.
Garrett but he and his wife.  And he [the prosecutor]
made a reference implying that he [Garrett] did not
testify, nobody else testified to verify what I just
said.  And you can't get around the fact that you made a
mistake.  You violated Mr. Garrett's rights when you
mentioned that.


BY MR. WEILBAECHER:

    Yes, I can.


BY MR. NUNNERY:

    Your Honor, I just want to assign error. I want us
to continue.


BY THE COURT:

    So you're not moving for a mistrial?


BY MR. NUNNERY:

    No, ma'am.  No, ma'am.  No, ma'am.


BY THE COURT:

    **Stay away from any reference that would even lead
anybody to the notion Mr. Garrett did not testify.**


BY MR. WEILBAECHER:

    Okay.  May I explain that I don't mean to say that
Mr. Garrett had any burden to do anything or to testify.


BY THE COURT:

    I know what you mean.  But what you say to a jury –
what I know that you mean and what you imply to a jury
through your words is something different.   And **you**

**cannot do anything, you can't make any statement that would lead the jury to even think that you are implying any reference to Mr. Garrett not testifying or not presenting any evidence. If you do that, you know you're going to get reversed on appeal.**

Mr. Nunnery is not moving for a mistrial. He simply is assigning error. We know if there is a conviction this will go up on appeal and he has assigned your comment as an error. **I am instructing you at this point to make no reference that would lead this jury to in any way consider or think anything about Mr. Garrett not testifying.**

(State rec., vol. 6 of 8, pp. 1273-1276 (emphasis added)).

The "Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." <u>Griffin v. California</u>, 380 U.S. 609, 615 (1965). "For there to have been a denial of one's fifth amendment right to remain silent, the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence, or the character of the remark must have been such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." <u>Jackson v. Johnson</u>, 194 F.3d 641, 652 (5th Cir. 1999), <u>cert</u>. <u>denied</u>, 529 U.S. 1027, 120 S.Ct. 1437, 146 L.Ed.2d 326 (2000) (citation omitted).

Based upon a review of the pertinent portions of the trial transcript, the Court does not find that it was the prosecutor's "manifest intent", in making the remark, to comment upon Mr. Garrett's failure to take the witness stand. Further, the

Court finds that the "character" of the remark was not such that the jury "would naturally and necessarily construe it" as a comment upon Garrett's silence.   As such, there was no constitutional violation and no basis for the trial court to grant a mistrial. Accordingly, counsel was not deficient in failing to move for a mistrial and Garrett was not prejudiced by counsel's failure to make such a motion.

> 3.   Failure to Object When Court Refused to Release
> Witness from Subpoena

Garrett next claims that counsel was ineffective when he failed to object when the trial court refused to release witness Joanie Wilson from her subpoena after she finished testifying. According to Garrett, the trial court's action "allowed the [S]tate['s] case-in-chief to remain open and mislead the defense. (Rec. doc. 4, p. 15).   Garrett explains:

> Clearly, in front of the jury, the [S]tate informed
> the trial court and the defense that this witness would
> not testify again, yet after the defense put its case
> forward, the State recalled this witness to the stand.
> Because the State misled the defense along with the jury,
> counsel should have objected and asked that this witness
> not be allowed to testify on those grounds.

(Rec. doc. 4, p. 16).

A review of the trial transcript reflects that after the prosecutor's direct examination and defense counsel's cross-

examination of State's witness, Joanie Wilson, the following exchange took place:

> BY THE COURT:
>
> You may step down.  Is this lady released from her subpoena?
>
> BY MR. WEILBAECHER:
>
> No, ma'am, though she's free to leave.
>
> BY THE COURT:
>
> But if she's called back, you would want her to come back immediately; is that correct?
>
> BY MR. WEILBAECHER:
>
> Yes, ma'am.
>
> BY THE COURT:
>
> You're still under subpoena and you're free to go. Don't discuss your testimony with anyone.
>
> BY THE WITNESS:
>
> Thank you.
>
> BY MR. WEILBAECHER:
>
> Or maybe I'll put it this way, I doubt - - I'm not going to recall her in my case in chief.
>
> BY THE COURT:
>
> I'll leave it as I said in the beginning.  You're still under subpoena.  Don't discuss your testimony.

(State rec., vol. 5 of 8, pp. 1083-1084).

This Court finds nothing misleading in the above exchange. The prosecutor represented to the trial court and to the jury that the witness would not be called back to the witness stand in connection with the State's case-in-chief and a review of the trial transcript reflects the prosecutor's representation to be correct. The witness, Joanie Wilson, was called back to the witness stand in connection with the State's rebuttal case. (State rec., vol. 6 of 8, p. 1236). Accordingly, defense counsel had no basis upon which to raise an objection.

### 4. Failure to Object to Testimony of Witness Second Time She Took the Witness Stand

Garrett claims that counsel was ineffective in failing to object when Wilson, once again, took the witness stand. Garrett contends that Wilson's second round of testimony was objectionable because it was outside the scope of the State's case-in-chief. (Rec. doc. 4, p. 17).

As explained above, Joanie Wilson took the witness stand a second time not in connection with the State's case-in-chief, but as part of the State's rebuttal case. As such, said testimony was not required to be within the scope of the State's case-in-chief. Thus, once again, counsel had no basis to object.

### 5. Failure of Appellate Counsel to Urge the Above Arguments on Direct Appeal

To prove that appellate counsel was ineffective, a petitioner must satisfy the two-prong test enunciated in Strickland, that counsel's performance was deficient and that the deficient performance prejudiced the defense. See Busby v. Dretke, 359 F.3d 708, 714 (5th Cir.), cert. denied, 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004) (citations omitted) ("The familiar Strickland framework applies to a prisoner's claim that his appellate counsel was ineffective for failing to raise a certain issue on appeal."). As shown below, Garrett has failed to satisfy his burden of proof.

Garrett argues that appellate counsel was ineffective due to counsel's failure to urge, on direct appeal, the above four arguments in support of the claim that Garrett received ineffective assistance of counsel. However, because the Court has determined the above arguments to be without merit, Garrett suffered no prejudice by virtue of appellate counsel's failure to raise these arguments on direct appeal. Further, Garrett was not prejudiced since he was able to raise these claims before the state courts via his post-conviction application.

6. Failure to Object to Improper Arraignment Procedure

Garrett argues that counsel was ineffective due to his failure to object to the fact that Garrett was arraigned shortly before trial commenced. As the Louisiana First Circuit, in addressing the instant claim, explained:

> At the start of the trial, prior to the first witness being called, the defendant was arraigned and pled not guilty. The trial court informed the defendant that he was entitled to a 30-day delay before trial following arraignment. The defendant informed the court that he was waiving any delays he may be entitled to and that they were ready to proceed to trial.

Garrett, 2007 WL at *8.

The Louisiana Fourth Circuit, after recognizing the applicable standard of review enunciated in Strickland, determined that Garrett's ineffectiveness claim "must fall" because "[i]f there was a defect in the arraignment, the defendant failed to show that any prejudice resulted." Id.

This Court finds that the above finding by the state appellate court does not represent an unreasonable application of Strickland to the facts of this case. Garrett has failed to set forth what prejudice he suffered by virtue of counsel's failure to object to the arraignment.

7. Failure to Adequately Prepare for Trial and Adequately Grasp Criminal Law and Procedure

Garrett claims that trial counsel was ineffective because he failed to adequately prepare for trial and did not have a proper understanding of criminal law and procedure. In support of his claim, Garrett sets forth the following alleged deficiencies on the part of counsel:

a) counsel filed a motion for oyer when such a motion had not been used for years in criminal practice;

23

b) in the bill of particulars counsel misspelled Garrett's name and listed the wrong charge;

c) counsel failed to adequately question the prosecution's expert witness, Joanie Wilson, regarding her qualifications;

d) counsel offered to stipulate to facts in an effort to move the case along;

e) the court, without objection from counsel, read in its preliminary instruction to jurors, the entire aggravated rape statute, LSA-R.S.14:42, rather than picking and choosing the applicable sections of the statute.

f) counsel failed to examine the personnel record of law enforcement officials who testified at trial;

g) counsel failed to "follow up" on his motion to have the victim examined by a defense expert to determine her competency to testify at trial and failed to "follow up" on his motion to inspect the State's physical evidence;

h) counsel failed to object to the prosecutor providing the jury, in his opening statement, with false information regarding the State's DNA evidence;

i) counsel lacked a proper understanding as to when he had to decide whether he wanted to proceed with a judge or jury trial;

j) counsel improperly advised the prosecution and the court of an alleged inculpatory statement made by Garrett, but did not provide a copy of the statement;

k) counsel improperly questioned a witness regarding whether or not a person who had recently engaged in sex had a "particular odor";

l) counsel improperly complemented law enforcement officials on their "chain of custody"; and,

m) counsel filed a motion for speedy trial when he was not ready for trial.

A glaring problem with the above list of alleged deficiencies on the part of counsel, for purposes of attaining federal habeas corpus relief, is that Garrett fails to set forth how he was prejudiced by these deficiencies.  Given the strong evidence presented against petitioner, as set forth in the above recitation of the facts, the Court finds that Garrett has failed to show a reasonable probability that but for the above deficiencies on the part of counsel, the result of his proceeding would have been different.

**B.   Improper Rebuttal Evidence**

Garrett argues that the trial court unconstitutionally allowed the State's DNA expert, Joanie Wilson, to present rebuttal testimony wherein she impermissibly testified to "new facts" and "simply repeated" the opinions she had provided during the State's case-in-chief.  (Rec. doc. 4, p. 24; rec. doc. 14, p. 13).

A review of the trial transcript reflects that Ms. Wilson testified on direct examination that she obtained a DNA profile from Garrett and from the victim, Joan Flood (J.F.).  Wilson explained that when you look at a DNA profile on paper, "it consists of a set of numbers." (State rec., vol. 5 of 6, p. 1049). Thereafter, Wilson obtained DNA profiles from evidence in the case, specifically, from stains on Garrett's underwear and a stain on a

25

tissue in a wastepaper basket in the bathroom of room 200. (State rec., vol. 5 of 6, p. 1051-1053). Wilson then compared the DNA profiles from Garrett and Flood with the DNA profiles from the evidence. (State rec., vol. 5 of 6, p. 1053). When she performed this comparison, she found that numbers contained in Garrett's DNA profile and numbers contained in Flood's DNA profile were also contained in the DNA profiles of the three underwear stains. (State rec., vol. 5 of 6, pp. 1062-1063). She found that numbers contained in Garrett's DNA profile were found in the DNA profile of the tissue stain. (State rec., vol. 5 of 6, p. 1069).

Following Wilson's testimony, the defense DNA expert, Ronald Acton, testified. It was Acton's opinion that because some of the numbers comprising Flood's DNA profile were missing from the evidence or stain DNA profiles, Flood could not properly be considered as a person whose DNA "contributed to that stain". (State rec., vol. 6 of 8, pp. 1196-1197).

Following Acton's testimony, the State, in rebuttal, once again called Ms. Wilson to the witness stand. (State rec., vol. 6 of 8, p. 1236). The prosecutor proceeded to question Wilson about the fact that not every number contained in Flood's DNA profile and Garrett's DNA profile is contained in the evidence DNA profiles. Wilson acknowledged this fact and explained the reason was because some of the evidence samples, from which the DNA profiles were obtained, were "low" samples, providing data below the detectable

26

level.  (State rec., vol. 6 of 8, p. 1237).  Wilson proceeded to
explain, however, that there were no DNA numbers from the evidence
samples that were "inconsistent" with the DNA profiles of Flood and
Garrett.

       To  support  Wilson's  claim  that  there  were  no
inconsistencies and, therefore, Garrett and Flood could not be
ruled out as potential donors with regard to the underwear stain
samples, the prosecutor proceeded to question Wilson with regard to
the pertinent samples.  Specifically, the prosecutor had Wilson set
forth the DNA numbers from the evidence samples, then set forth the
DNA numbers from Garrett's profile and Flood's profile, and then
compare them to show that there were no inconsistencies.  (State
rec., vol. 6 of 8, pp. 1237-1247).  While this examination was
lengthy and did, to a certain extent, reiterate some of the
evidence presented in the State's case-in-chief, it did not fall
outside the scope of rebuttal testimony.  It was aimed at rebutting
Acton's testimony to the effect that if all of Flood's DNA profile
numbers were not found in the evidence DNA samples, then Flood
should not be considered a donor.  Accordingly, the Court finds
Garrett suffered no violation of his constitutional rights by
virtue of the trial court allowing this testimony.

### C.  Prosecutorial Misconduct

       Garrett  argues  that  his  constitutional  rights  were
violated by the prosecutor's improper remarks during closing

arguments.  According to Garrett, the prosecutor improperly vouched for the credibility of witnesses Tabitha May, Georgette Taylor, and Deshone Cook, by misstating their testimony.

It is true that it is improper for a prosecutor to vouch for a witness' credibility where there is underlying an implication that the prosecutor's statements are based on additional personal knowledge about the witness or on facts not in evidence.  See, e.g., United States v. Munoz, 150 F.3d 401, 414 (5th Cir. 1998), cert. denied, 525 U.S. 1112, 119 S.Ct. 887, 142 L.Ed.2d 786 (1999).  However, such comments are not necessarily improper if it is apparent to the jury that the views are based on the evidence presented at trial rather than on personal knowledge of facts outside the record.  See, e.g., Nicolos v. Scott, 69 F.3d 1255, 1282-1283 (5th Cir. 1995), cert. denied, 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996); State v. Sawyer, 350 So.2d 611, 614 (La. 1977).

A comparison of the prosecutor's alleged unlawful remarks (State rec., vol. 6 of 8, pp. 670, 671 and 674), with the testimony of witnesses May (State rec., vol. 5 of 6, pp. 1087-1108), Taylor (State rec., vol. 5 of 6, pp. 1142-1156), and Cook (State rec., vol. 4 of 8, pp. 911-916), reflects that the prosecutor's remarks were no more than his summation of and deduction from the evidence. There was no implication that his comments were based on additional personal knowledge about the witnesses or on facts not in evidence.

As such, the Court finds that the comments do not cross an impermissible line.

Garrett also argues that the prosecutor, during closing arguments, violated his Fifth Amendment by "informing the jury that the petitioner did not testify at trial to dispute he did not commit the crime." (Rec. doc. 4, p. 27; rec. doc. 14, p. 14). However, a review of the pertinent portion of the transcript (State rec., vol. 6 of 8, p. 1272) reflects that Garrett's assertion is incorrect.

As stated earlier, "[f]or there to have been a denial of one's fifth amendment right to remain silent, the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence, or the character of the remark must have been such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." Jackson, 194 F.3d at 652. Based upon a review of the prosecutor's remark, the Court does not find that it was the prosecutor's "manifest intent", in making the remark, to comment upon Mr. Garrett's failure to take the witness stand. Further, the Court finds that the "character" of the remark was not such that the jury "would naturally and necessarily construe it" as a comment upon Garrett's silence. As such, there was no constitutional violation.

**D.   Insufficient Evidence**

Garrett argues that the evidence submitted at trial was insufficient to support his aggravated rape conviction. Garrett asserts that the Louisiana First Circuit Court of Appeal, in determining that the evidence was not insufficient to support his conviction, erred because the court ignored inconsistent evidence, i.e., evidence which did not support his conviction. In particular, Garrett relies on the testimony of Dr. Kevin Erwin, along with the crime lab report, which established that contrary to Dr. Erwin's initial opinion, there was "no ejaculate" in the victim's vagina or pubic area. (Rec. doc. 7-2, p. 2). Garrett also relies on the testimony of defense DNA expert, Ronald Acton, who believed, based upon his analysis of the DNA testing, that the victim should be eliminated as a potential donor. (Rec. doc. 7-2, p. 3).

In analyzing the instant claim on direct appeal, the Louisiana First Circuit first examined applicable law.

> A conviction based on insufficient evidence cannot stand as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, §2. In reviewing claims challenging the sufficiency of the evidence, this Court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La.C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308–1309 (La.1988). The Jackson standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S.

15:438 provides that, in order to convict, the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence.  State v. Patorno, 2001-2585, p. 5 (La.App. 1st Cir.6/21/02), 822 So.2d 141, 144.

Garrett, 2007 WL at *3 (emphasis original).

Thereafter, the state appellate court examined the pertinent statutes in order to discern what the State was required to prove to support a guilty verdict on the charge of aggravated rape.

Louisiana Revised Statute. 14:42 provides in pertinent part:

A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:

(6) When the victim is prevented from resisting the act because the victim suffers from a physical or mental infirmity preventing such resistance.

C. For purposes of this Section, the following words have the following meanings:

(2) "Mental infirmity" means a person with an intelligence quotient of seventy or lower.[7]

Louisiana Revised Statute 14:41 provides in pertinent part:

---

[7]The State's expert witness, Dr. Raphael Salcedo, a forensic psychologist, testified that J.F. had an IQ of 54.

A. Rape is the act of anal, oral, or
vaginal sexual intercourse with a male or
female person committed without the person's
lawful consent.

B. Emission is not necessary, and any sexual
penetration, when the rape involves vaginal or
anal intercourse, however slight, is sufficient
to complete the crime.

Garrett, 2007 WL at 4.

Following the above recitation, the Louisiana First

Circuit examined the DNA evidence presented at trial via the

testimony of Joanie Wilson and Ronald Acton, noting, as Garrett has

pointed out, that Acton disagreed with Wilson's findings, believing

that the victim should not be considered a potential DNA donor in

connection with the DNA-tested criminal evidence, specifically, the

stains on Garrett's underwear.   The court then reviewed the

testimony of two of the lay witnesses, Tabitha May and Georgette

Taylor.

The testimony elicited at trial established that
shortly after the defendant was seen coming out of the
bathroom in room 200 zipping up his pants, J.F. was found
in that bathroom struggling to pull up her pants.
According to May, the defendant was acting nervous and
out of character.  According to Taylor, when she found
J.F., J.F. looked scared and was holding herself around
her lower stomach toward the vaginal area.  While Taylor
was helping J.F. get undressed, Taylor noticed some blood
in J.F.'s briefs.[8]

---

[8]The court further noted that the physical examination
performed on the victim at the hospital reflected that the victim
had "a small vaginal tear".  Id.

<u>Garrett</u>, 2007 WL at 5 (footnote added).

Thereafter, the state appellate court reasoned:

The guilty verdict reflects the jury's reasonable
conclusion that J.F.'s physical condition upon being
found, i.e., scared and in pain with a vaginal tear,
coupled with the scientific evidence introduced at trial,
was sufficient to establish the elements of aggravated
rape, specifically the element of penetration. Louisiana
Revised Statute 14:41(B) provides that "[e]mission is not
necessary" and that "any sexual penetration, when the
rape involves vaginal or anal intercourse, however
slight, is sufficient to complete the crime." <u>See</u> <u>State
v. Rives</u>, 407 So.2d 1195, 1197 (La.1981). That the jury
chose to believe one expert witness over another is an
issue of credibility. In the absence of internal
contradiction or irreconcilable conflict with physical
evidence, one witness's testimony, if believed by the
trier of fact, is sufficient support for a requisite
factual conclusion. <u>State v. Thomas</u>, 2005-2210, p. 8
(La.App. 1st Cir.6/9/06), 938 So.2d 168, 174.

The fact that the record contains evidence which
conflicts with the testimony accepted by a trier of fact
does not render the evidence accepted by the trier of
fact insufficient. <u>State v. Quinn</u>, 479 So.2d 592, 596
(La.App. 1st Cir.1985). We are constitutionally
precluded from acting as a "thirteenth juror" in
assessing what weight to give evidence in criminal cases.
<u>See</u> <u>State v. Mitchell</u>, 99-3342, p. 8 (La.10/17/00), 772
So.2d 78, 83.

After a thorough review of the record, we find that
the evidence supports the jury's verdict. We are
convinced that viewing the evidence in the light most
favorable to the State, any rational trier of fact could
have found beyond a reasonable doubt, and to the
exclusion of every reasonable hypothesis of innocence,
that the defendant was guilty of aggravated rape.

<u>Garrett</u>, 2007 WL at *5-6 (footnote omitted).

This Court finds that the Louisiana First Circuit's determination, set forth above, does not represent an unreasonable application of <u>Jackson</u> to the facts of this case. Accordingly, Garrett's claim for habeas corpus relief is without merit.

### E.  Denied Right to Testify

Garrett argues that his constitutional rights were violated because his counsel would not allow him to testify at trial. Garrett raised this same claim on direct appeal and the Louisiana First Circuit, in addressing Garrett's claim, noted that Garrett never complained at trial that he wanted to testify. Instead, he waited until after he was convicted, at sentencing, to raise the issue.

> Following his conviction, the defendant addressed the trial court at sentencing. In pertinent part, the defendant stated, "When I got to that unit and I walked on the unit-and, believe me, I wanted to testify, because I wanted to correct every lie that they told." At no time during the trial did the defendant object or complain about his right to testify. There is nothing in the entire trial record to suggest that the defendant's alleged desire to testify was rebuffed by his counsel or the trial court. The defendant's postconviction conclusory allegation is insufficient to rebut the presumption arising from his silence at trial that he waived his right to testify. If the defendant is suggesting that he was forbidden to testify or in some way compelled to remain silent, he must allege specific facts and point to record evidence to support his claim. <u>See</u> <u>State v. James</u>, 2005-2512 (La.9/29/06), 938 So.2d 691 (<u>per</u> <u>curiam</u>). Having failed to do this, the defendant has made no showing that his right to testify was violated.

<u>Garrett</u>, 2007 WL at *6.

"A criminal defendant has a constitutional right to testify in his own behalf; it is an aspect of his right to defend himself, a right held in Rock v. Arkansas, 483 U.S. 44, 51-53 (1987), to be implicit in the Fifth, Sixth and Fourteenth Amendments." Underwood v. Clark, 939 F.2d 473, 475 (7th Cir. 1991) (citations omitted); see also White v. Cain, 2006 WL 3703240, *4 (E.D. La. 2006). A habeas petitioner, however, has the burden of proving that he was denied this constitutional right. As the court explained in Turcios v. Dretke, 2005 WL 3263918, *6 (S.D.Tex. 2005), "a petitioner in a habeas proceeding cannot prevail on such a claim merely by stating to the habeas court that he told his trial attorney that he wished to testify and that his attorney forbade him from taking the witness stand. Underwood v. Clark, 939 F.2d 473, 475-76 (7th Cir. 1991)." The Underwood court specifically noted the potential problem posed if a habeas petitioner, arguing that counsel unconstitutionally denied him his right to testify, is not required to satisfy his burden of proof.

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable. It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." That's what Underwood did. His affidavit, which is the only evidence bearing on the question, states, so far as pertinent here, "I was denied the opportunity to testify at my own trial in that I told

my attorney that I wished to testify on my own behalf.
My attorney told me I could not testify.
    We agree with the First Circuit's ruling in
<u>Siciliano v. Vose</u>, 834 F.2d 29, 31 (1st Cir. 1987), that
this barebones assertion by a defendant, albeit made
under oath, is insufficient to require a hearing or other
action on his claim that his right to testify in his own
defense was denied him.  It just is too facile a tactic
to be allowed to succeed.  Some greater particularity is
necessary-and also we think some substantiation is
necessary, such as an affidavit from the lawyer who
allegedly forbade his client to testify-to give the claim
sufficient credibility to warrant a further investment of
judicial resources in determining the truth of the claim.

<u>Underwood</u>, 939 F.2d at 475-76.

    In the instant matter, as the Louisiana First Circuit noted, there is no evidence to prove Garrett's claim other than his "postconviction conclusory allegation" that he was denied his constitutional right to offer testimony at trial.  "Standing alone, such self-serving statements cannot be allowed to succeed or the criminal judicial process would become unworkable." <u>Turcios</u>, 2006 WL at *6 (citing <u>Underwood</u>, 939 F.2d at 475-76).  Accordingly, the Court finds that Garrett has failed to meet his burden to establish that he is entitled to habeas corpus relief.

    **F.  Cases Were Improperly Combined and Consolidated**

    Garrett argues that his constitutional rights were violated by virtue of the fact that his two court cases were improperly combined and consolidated and that the record is not complete.  As the Louisiana First Circuit explained, Garrett "was allegedly originally charged with attempted aggravated rape, which was docketed as case number 389636.  Following the grand jury's

indictment for aggravated rape, the case was docketed as case number 393935." Garrett, 2007 WL at *6 (footnote omitted). Garrett complains that rather than properly consolidating the two cases, the clerk of court haphazardly placed pleadings from the first case into the second case and, as a result, "there is nothing in this record relative to case no. 389,636, so it is impossible to know what motions were filed and argued therein, and whether they are relevant to petitioner's current case, no. 393-935." (Rec. doc. 7-2, p. 7).

In addressing, and ultimately rejecting, the instant claim, the Louisiana First Circuit first recognized that "[u]nder La. Const. Art. I, §19, no person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based on a complete record of all evidence on which judgment is based." Garrett, 2007 WL at *6. However, the state appellate court noted that Garrett "failed to lodge any objection at trial regarding this issue. See La.C.Cr.P. art. 841(A)." Garrett, 2007 WL at *7. Further, the court observed that Garrett had made no showing that any of the pre-trial proceedings from his first case, no. 389636, that were not transcribed and therefore, not part of the record, included rulings on evidence ultimately presented at trial. Id.

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state

court rests on a state ground that is both independent of the federal claim and adequate to support that judgment. Coleman v. Thompson, 501 U.S. 722, 731-32 (1991); Glover v. Cain, 128 F.3d 900, 902 (5th Cir. 1997); Amos v. Scott, 61 F.3d 333, 338 (5th Cir.1995) (citing Harris v. Reed, 489 U.S. 255, 260, 262 (1989)). This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review. Amos, 61 F.3d at 338.

Procedural default does not bar federal court review of a federal claim raised in a habeas petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar. Harris, 489 U.S. at 263; Glover, 128 F.3d at 902. When the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, it is presumed that the court relied upon the same grounds as the last reasoned state court opinion. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In the instant matter, the state appellate court issued the last reasoned opinion, denying Garrett's claim based upon his failure to lodge an objection as required under La.C.Cr.P. art. 841(A).

It is well-settled that Louisiana's contemporaneous objection rule is an independent and adequate state procedural ground, regularly applied by the Louisiana courts. Duncan v. Cain, 278 F.3d 537, 541 (5th Cir. 2002) (citing Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977)); Marshall v. Cain, 2006 WL 2414073 (E.D. La. Aug. 18, 2006) (Zainey, J.). When the state court relies on this procedural default in dismissing a claim, as it did here, the claim is generally barred from federal habeas review. Duncan, 278 F.3d at 541; Riles v. McCotter, 799 F.2d 947, 953 (5th Cir. 1986) (challenge to state's expert was procedurally barred from federal habeas review where state applied procedural default for failure to object at trial).

A federal habeas petitioner, however, may be excepted from the procedural default rule if he can show "cause" for his default and "prejudice attributed thereto," or demonstrate that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice." Glover, 128 F.3d at 902 (citing Coleman, 501 U.S. at 731-32); Amos, 61 F.3d at 338-39 (citing Harris, 489 U.S. at 262; Engle v. Isaac, 456 U.S. 107, 129, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)).

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule. Murray v. Carrier, 477 U.S. 478, 488 (1986). The mere fact that

39

petitioner failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default. Id. at 486.

In this case, Garrett suggests that because defense counsel erred in not raising an objection, the issue should not be waived pursuant to La.C.Cr.P. art. 841. (Rec. doc. 7-2, p. 7). However, such a misstep on the part of counsel is clearly not a "factor external to the defense" as required to constitute cause. Accordingly, the Court finds that Garrett has failed to make the requisite showing of cause to justify his failure to comply with the requirements of La.C.Cr.P. art. 841.

"The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." Hoque, 131 F.3d 466, 497 (5th Cir.1997) (citing Engle, 456 U.S. at 134 n. 43). Having failed to show an objective cause for his default, the court need not determine whether prejudice existed, and petitioner has not alleged any actual prejudice. Ratcliff v. Estelle, 597 F.2d 474 (5th Cir.1979) (citing Lumpkin v. Ricketts, 551 F.2d 680, 681-82 (5th Cir.1977)).

The instant claim is therefore procedurally barred from review by this federal habeas corpus court absent a showing that a fundamental miscarriage of justice will occur if the merits of the claim are not reviewed. Hoque, 131 F.3d at 497 (citing Sawyer v. Whitley, 505 U.S. 333, 339 (1992)). To establish a fundamental

miscarriage of justice, a petitioner must provide the court with evidence that would support a "colorable showing of factual innocence." Kuhlmann v. Wilson, 477 U.S. 436, 454, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986); accord Murray, 477 U.S. at 496; Glover, 128 F.3d at 902.   To satisfy the factual innocence standard, a petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to his guilt. Campos v. Johnson, 958 F.Supp. 1180, 1195 (W.D. Tx.1997) (footnote omitted); Nobles v. Johnson, 127 F.3d 409, 423 n. 33 (5th Cir. 1997), cert. denied, 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998) (actual innocence factor requires a showing by clear and convincing evidence that "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.")  When the petitioner has not adequately asserted his actual innocence, his procedural default cannot be excused under the "fundamental miscarriage of justice" exception. Glover, 128 F.3d at 903.

Garrett does not present and the record does not contain evidence that suggests his actual innocence.  Accordingly, Garrett has failed to overcome the procedural bar to the instant claim.  As such, the claim is procedurally barred and must be dismissed with prejudice for that reason.

Alternatively, Garrett's claim is without merit. The Supreme Court has held that an indigent defendant is entitled to a free copy of the trial transcript to have a meaningful appeal. Hardy v. United States, 375 U.S. 277 (1964). However, the State is not "obligated to automatically supply a complete verbatim transcript," Moore v. Wainwright, 633 F.2d 406, 408 (5th Cir.1980), and a State need not waste its funds providing for free those parts of the transcript that are not "germane to consideration of the appeal." Draper v. State of Washington, 372 U.S. 487, 495 (1963).

Louisiana law complies with these constitutional standards. Appellate review in Louisiana is restricted to questions of law based on defense objections and assignments of error. State v. Francis, 345 So.2d 1120, 1125 (La.) (citing La. Const. Art. 5, § 5(C) (1974) and La. Code Crim. P. art. 841), cert. denied, 434 U.S. 891, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977). Thus, when the transcript and record contain the portions necessary to address the issues actually raised on appeal, including those portions where objections were made by counsel, the record is constitutionally sufficient for a meaningful appeal. Schwander v. Blackburn, 750 F.2d 494 (5th Cir. 1985).

In the instant matter, as the state appellate court noted, Garrett makes no showing regarding what pretrial proceedings from his earlier case, 389636, were objectionable. It is well settled that the State is not "required to furnish complete

transcripts so that the defendants . . . may conduct 'fishing expeditions' to seek out possible errors at trial." Jackson v. Estelle, 672 F.2d 505, 506 (5th Cir.1982). The law also does not require a more complete transcript when a petitioner is completely unable "to indicate one specific error committed during the portions of trial not included in the record." Cf. United States v. Renton, 700 F.2d 154, 159 (5th Cir.1983).

## G.  Denied Right to Confront Accuser

Garrett has framed this issue as a claim that he was denied his right to confront his accuser, Joan Flood (J.F.). However, as reflected below, Garrett is actually setting forth another ineffective assistance of counsel claim.

In addressing Garrett's claim that he was denied his right to confront his accuser, the Louisiana First Circuit provided:

> The defendant asserts in his brief that the entire trial process was completed and he was convicted without a determination of the alleged victim's competency and without her being called to testify. This assertion is erroneous. At trial, on cross-examination, Dr. Ciaccio testified that J.F. was incapable of testifying at trial, and defense counsel concurred:
>
> Q. Participating in this trial. Are you saying she's 100 percent incapable of testifying or in any way participating in this trial?
>
> A. I would say yes.

43

> Q. And we concur with you.  We do.  We concur
> with you.  We think she's incapable too.  I've
> gone through a stack of your medical records.
> **I referred to a physician myself** and we have
> no problems with that.  She's completely
> incapable of participating in this trial.

Later during trial, the defendant stipulated that
J.F. was incompetent to testify and specifically waived
his right to confront his accuser.  Following is the
relevant portion of the colloquy between defense counsel
and the trial court:

> Mr. Nunnery [defense counsel]:  I never [saw]
> the need for the jury to see [her].  In fact
> I've been stipulating here all day that she's
> 100 percent incompetent.  We have no problem
> with that.  We don't need to confront her.
> And we can't confront her anyway if she's
> incompetent.

> By the Court:  So is it my understanding that
> at this point you are-everybody may sit down-
> that you are stipulating that if [J .F.] were
> to be brought into the courtroom, that Mr.
> Garrett's right to confront would be useless
> since she is incompetent and would not be able
> to answer any questions anyway; therefore, he
> is not raising any objection to her not being
> brought to the courtroom and is not raising
> the issue of violating his right to confront
> his accuser?

> By Mr. Nunnery:  Absolutely, Your Honor. We'll
> go on record with that, exactly as you have
> stated it.  And the only other-there would be
> no probative value outside of that to bring
> her in here.

The defendant did not object to the finding of the
State's expert witness that J.F. was incompetent to
testify.  Moreover, the defendant stipulated to J.F.'s
incompetence and waived his right to confront her.
Accordingly, this assignment of error is without merit.

Garrett, 2007 WL at 9 (emphasis added).

In the instant habeas petition, Garrett acknowledges the state appellate court's recognition of the fact that he did not object to the finding of the State's expert that Joan Flood (J.F.) was incompetent to testify.  (Rec. doc. 7-2, p. 23).  However, Garrett contends that such a failure to object represents "yet another clear example of ineffective assistance of counsel, where trial counsel stipulated to the victim's incompetence without ensuring a formal court hearing or assessment by his own expert. Defense counsel effectively waived petitioner's right to confront his accuser by not conducting or pushing for a complete court hearing, prior to trial, and with an examination by experts of the defense's choosing."  (Rec. doc. 7-2, p. 23).

It is well-established that counsel, for purposes of overcoming an ineffectiveness claim, are "not required to make futile motions or objections." Koch v. Puckett, 907 F.2d 524, 527 (5th Cir.1990) (citing Murray v. Maggio, 736 F.2d 279, 283 (5th Cir.1984) (per curiam)).  A review of Dr. Ciaccio's testimony reflects that there was little doubt that Joan Flood was incompetent to testify and bringing her to court would have been a waste of time.  For example, Dr. Ciaccio testified that he performed "the most common [mental status] test used in the office", a test wherein a "person could score relatively well and have significant dementia." (State rec., vol. 4 of 8, p. 848).  He stated that Joan Flood "scored 1 out of 30 which puts her in the

very severe range on that particular test." Id. Dr. Ciaccio went

on to explain the mental status test he performed as follows:

> A.  Well, it consists of 30 points.  The first . . . ten
> are orientation questions.  You ask the person the date,
> what is the month, the day of the week, the year, the
> season of the year . . . .  Then . . . what city, state
> you're in, the name of the facility, the floor you're on.
> And you give them three words, ask them to repeat them
> right back to you, and then you go on to tell them to
> remember them if they can.  You test concentration - -
>
> Q.  Let me stop you for a second, Doctor.  You just went
> through a number of the . . . questions.  How many of
> those did she get right?
>
> A.  Let's see.
>
> Q.  I believe you said she got one right.  What was that?
>
> A.  Well, she received one [point] for giving immediate
> recall.  I give three words, it's usually unrelated
> words, and she was able to repeat one of them back to me
> but then could not immediately tell me the other two.  So
> that's the only point that she received on that initial
> test.
>
> Q.  So she couldn't tell you where she was, what day it
> was, any of those sort of things?
>
> A.  No.  She really had difficulty, I'm just looking at
> the report here, could not put words together to make a
> sentence.  Her thoughts were loose.  She could give one-
> or two-word answers but really couldn't give a logical
> stream of thought in a sentence.

(State rec., vol. 4 of 8, pp. 849-850).

        Based upon the above, the Court finds that Garrett has

failed to show that counsel was deficient in not objecting to Dr.

Ciaccio's testimony and not having Joan Flood tested "by experts of

the defense's choosing."  There is nothing to suggest that a

different expert would have reached a different conclusion.

Accordingly, petitioner did not suffer a violation of his

46

constitutional rights by virtue of the fact that the victim, Joan Flood, did not offer testimony at trial and that his counsel did not challenge the fact that Joan Flood was not competent to offer testimony at trial.

## H.  Erroneous Jury Instructions

Garrett asserts that his constitutional rights were violated by virtue of the trial court's erroneous jury charges.  As the Louisiana First Circuit explained, in addressing Garrett's claim on direct appeal, Garrett complains that the definition of "stipulations" provided to jurors removed the role of fact finder from the jury, alleviating the burden of the State.[9]  Further, Garrett complains that the trial court failed to emphasize the responsive verdict of "not guilty."[10]  Finally, Garrett argues that

---

[9]The objectionable jury charge, as set forth by the First Circuit, is as follows: "Stipulations and agreed facts: When the district attorney and the attorney for the defendant stipulate or agree to the existence of a certain fact or facts, you must accept such stipulated or agreed fact or facts as conclusively proved."

Garrett, 2007 WL at *9 n. 15.

[10]As the state appellate court explained:
> The trial court listed all of the responsive verdicts, including "not guilty".  It further stated, "If the State has failed to prove beyond a reasonable doubt that the defendant is guilty of the offense charged or of any of the lesser included offenses, the form of your verdict should be: We, the jury, find the defendant not guilty."

Garrett, 2007 WL at *9 n. 16.

47

the trial court, by reading the entire aggravated rape statute to jurors, improperly reduced the State's burden of proof.

The Louisiana First Circuit Court of Appeal, in addition to finding "nothing erroneous with these jury instructions", Garrett, 2007 WL at *9 n. 18, rejected Garrett's claim based on his failure "to object to the jury instructions . . . . See La.C.Cr.P. arts. 801(C) and 841(A); see State v. Parker, 98-0256 (La. 5/8/98), 711 So.2d 694, 695 (per curiam)." Garrett, 2007 WL at *9 (footnote omitted).

As set forth earlier, a federal court generally will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support that judgment. See Coleman, supra. Further, it is well-settled that Louisiana's contemporaneous objection rule is an independent and adequate state procedural ground. See Duncan, supra. Thus, Garrett can escape having the instant claim deemed to have been waived only upon a showing of "cause" and "prejudice" or a demonstration that the court's failure to review the instant claim will result in a "fundamental miscarriage of justice." See Glover, supra. To establish "cause", Garrett must show that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule. See Murray, supra.

48

Once again, Garrett suggests that he should be excused for his procedural default because it was due to counsel's ineffectiveness that an objection was not raised. (Rec. doc. 7-2, p. 25). However, as noted earlier, such a misstep on the part of counsel does not constitute a factor external to the defense. Further, the Court finds that Garrett has failed to show that a "fundamental miscarriage of justice" will occur if the merits of the instant claim are not reviewed. See Hoque, supra. Thus, Garrett, once again, has failed to overcome the procedural bar to the claim at hand.

## I. Prosecutorial Misconduct

Finally, Garrett argues that he was denied due process by virtue of the prosecutor's factual misstatements during opening arguments. As set forth by the Louisiana First Circuit, Garrett asserts that the prosecutor misspoke when he stated that the "Woods lamp" employed by Dr. Erwin during a gynecological examination of Joan Flood indicated that there was "some sort of biological substance in that area." Garrett, 2007 WL at *10.[11] Further, the prosecutor, during opening argument, misrepresented that Wilson, pursuant to her DNA examinations of Garrett's underwear, "determined that there was a greater percentage of female DNA to

---

[11]Garrett, however, acknowledges that the prosecutor's misstatement was "later somewhat clarified". (Rec. doc. 7-2, p. 27).

49

male DNA, and that that would increase the likelihood of penile oral or vaginal contact between [Joan Flood] and Mr. Garrett." Id.

In rejecting the above claim, the Louisiana First Circuit Court of Appeal first noted that a "prosecutor's opening statement is not evidence and has no probative force." Id. Further, the court reasoned that Garrett "has not shown, nor does the record indicate, that he suffered any clear and substantial prejudice from the remarks. In addition, there is no indication of prosecutorial bad faith, as the State made every effort to admit evidence at trial relative to the allegedly objectionable portions of its opening statement. Id. (Citations omitted).

Given the overwhelming evidence submitted by the State to support the jury's guilty verdict, this Court agrees with the state appellate court's finding to the effect that Garrett was not prejudiced by the prosecutor's alleged misstatements. Further, the Louisiana First Circuit's determination that petitioner, based upon the lack of prejudice, was not entitled to relief represents a reasonable application of Supreme Court law. In United States v. Young, 470 U.S. 1, 11-12 (1985), the Supreme Court made clear that absent prejudice, a prosecutor's misleading statements during opening or closing arguments does not warrant habeas corpus relief. See also Casas v. Hedgpeth, 2010 WL 2951247, *16 n.6 (C.D. Cal. Jul 23, 2010).

Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the petition of Derrick Garrett for issuance of a writ of habeas corpus under 28 U.S.C. §2254 be **DISMISSED WITH PREJUDICE.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. §636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996)(<u>en banc</u>).[12]

New Orleans, Louisiana, this <u>15th</u> day of _____ March _____, 2011.


_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

---

[12]<u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.

51